# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### WACO DIVISION

RODRICK JACKSON,            )
                              )
           Plaintiff,     )
                              )
       vs.               )Case No. 6:18-CV-15-RP
                              )
CITY OF HEARNE, TEXAS, JOHN NARON )
PEE WEE DRAKE, RUBEN GOMEZ, EMMETT )
AGUIRRE, MARGARET SALVAGGIO, BRYAN )
F. RUSS, JR., THOMAS WILLIAMS,    )
STEPHEN YOHNER, PATRICIA MENDOZA,  )
STEPHANIE RODRIGUEZ,           )
TANGERLIA TAYLOR-FELTON,        )
           Defendants.    )
_____)

### TRANSCRIPT EXCERPT OF PRELIMINARY INJUNCTION PROCEEDINGS
### BEFORE THE HONORABLE ROBERT PITMAN,
### MONDAY, JANUARY 29, 2018, 3:03 P.M.

FOR THE PLAINTIFF:  TY CLEVENGER, ESQ.

FOR THE DEFENDANT:  MICHAEL W. DIXON, ESQ.

Proceedings recorded by mechanical stenography, transcript
produced using computer aided transcription.

**Pamela J. Andasola, CSR/RMR/FCRR**
FEDERAL OFFICIAL COURT REPORTER
355 EAST CESAR E. CHAVEZ BLVD.
SAN ANTONIO, TEXAS 78210

1          **I N D E X   P A G E**

2

3    **WITNESSES:**                                    **PAGE**

4      For the Plaintiff:

5          **RODRICK JACKSON, SENIOR**

6            Direct Examination By Mr. Clevenger        3

7            Cross-Examination By Mr Dixon              12

8            Redirect Examination By Mr. Clevenger      23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **AFTERNOON SESSION, JANUARY 29, 2018**

2                              *****

3                (The following transcript is an excerpt

4                of the testimony of Rodrick Jackson,

5                Sr., as per the request of ordering

6                counsel.)

7                              *****

8                THE COURT:  Any further witnesses?

9                MR. CLEVENGER:  Yes, Your Honor, two more, first

10  of which will be Mr. Jackson himself.

11                THE COURT:  Mr. Jackson?

12                Raise your right hand, please.

13                    **RODRICK JACKSON, SENIOR,**

14  was called as a witness and, having been first duly sworn,

15  testified as follows:

16                THE WITNESS:  I do.

17                        ==================
                          DIRECT EXAMINATION
18                        ==================

19  BY MR. CLEVENGER:

20      **Q.**   Mr. Jackson, would you state your full name for

21  the Court, please.

22      A.   Rodrick Jackson.

23      **Q.**   Rodrick Jackson, Senior?

24      A.   Senior.

25      **Q.**  Yes, sir.

1        How long have you lived in Hearne?

2    A.   Lived in Hearne, to my recollection, I think six

3 or seven years.

4    Q.   Okay.  And how long have you been on the council?

5    A.   I have been on the council -- this is my second

6 year.

7    Q.   And you've heard all the testimony here by the

8 witnesses today, correct?

9    A.   Yes, sir.

10    Q.   I want to ask you about the allegations in the

11 Class C misdemeanor charge against you.  Did you touch this

12 female accuser at all or did you touch her in a -- did you

13 touch her in a sexual way?

14    A.   No, sir.

15    Q.   Did you kiss her?

16    A.   No, sir.

17    Q.   Did you touch her at all?

18    A.   That day, by telling her it's going to be okay.

19    Q.   Was that out in public or was that in private?

20    A.   That was in public.

21    Q.   So you never touched her in private?

22    A.   No, sir.

23    Q.   How do you get along with Mr. Naron?

24    A.   We don't.

25    Q.   Has -- in your observation, is Mr. Naron prone to

1  be vindictive?

2      A.   Yes, sir.

3      **Q.**   Does he get angry when City Council members don't

4  do what he wants them to do?

5      A.   Yes, sir.

6      MR DIXON:  Objection, leading.  I'm going to let

7  it go, but just wanted to make an objection.

8      MR. CLEVENGER:  Okay.

9      Q.   (By Mr. Clevenger)  Does he play favorites on the

10  council?

11      A.   Yes, sir.

12      **Q.**   Do you frequently vote against his wishes?

13      MR DIXON:  Objection, leading.

14      Q.   (By Mr. Clevenger)  Do you sometimes vote against

15  his wishes?

16      A.   Yes, sir.

17      **Q.**   How often?

18      A.   Now, how often -- not as often as I did because

19  I'm defeated.

20      **Q.**   Tell me what you mean by that, that you are

21  defeated?

22      A.   Because they do what they want to do and it's just

23  my vote or Ms. Castilleja's vote against the other council

24  members and I'm tired.

25      **Q.**   Okay.  I want to ask you about some allegations in

1  the original -- or in the Complaint.  In 2015, what kind of

2  open-records request were you serving on the City?

3      A.    There were open requests for statements behind

4  things that was purchased with City money.

5      Q.    So financial records?

6      A.    Financial records.

7      Q.    Did you file one about utility records?

8      A.    Yes, sir.

9      Q.    What happened when you did?

10      A.    My utilities were then shut off.

11      Q.    Did they turn your power back on immediately?

12      A.    I wouldn't say immediately, I had to threaten to

13  call an attorney.

14      Q.    And how long did it take them to turn your power

15  back on?

16      A.    I think it was three or four, five hours later.

17      Q.    Okay.  In your open-records request, what did you

18  discover about the City Manager's credit card?

19      A.    It had been used to purchase football tickets,

20  ceiling fans, doors for the mayor's house, and these were

21  things that were brought to me by employees of the City.

22      Q.    And so, I want to clarify, was this his personal

23  credit card or City credit card?

24      A.    City's credit card.

25      Q.    Do you recall approximately when you were accused

1  of improper contact with the female minor?

2      A.   The specific date, I don't recall that date.  I do

3  know it was somewhere in June or July.

4      Q.   Okay.  How long had you known this girl that has

5  accused you?

6      A.   Ever since she was, pretty much, a baby.

7      Q.   Why was she at your house?

8      A.   Her mother had kicked her out.

9      Q.   And did you talk to her mother about that?

10      A.   I did, yes, sir.

11      Q.   And was she staying at your house with permission?

12      A.   Yes, sir.

13      Q.   Were you working as a Baptist minister at that

14  time?

15      A.   Yes, sir.

16      Q.   Were you working as a school-bus driver at that

17  time?

18      A.   Yes, sir; and the truancy officer, attendance

19  officer.

20      Q.   And have you lost all of those jobs?

21      A.   Yes, sir.

22      Q.   And is it the result of these accusations?

23      A.   Yes, sir.

24      The school, the school jobs, yes, sir; and I don't

25  know if it was a result with the preaching.

1    **Q.**   Okay.  Did you ask this young woman's relatives if
2    they would give her a place, or did they say they would give
3    her a place to stay?

4    A.   I talked with her grandmother on the phone and
5    asked her could she come stay with her and she said, No, her
6    mother needs to bring her back home.  And I said, Well, I
7    don't want to throw her out on the street.  I'm not going to
8    throw her out on the street.  She's been like my child, a
9    grandchild, for many years and I don't -- I don't mistreat
10   children.

11   **Q.**   Did you talk with a constable that day about
12   trying to get legal custody?

13   A.   I did.

14   **Q.**   And during that day, did you ever flirt with her?

15   A.   No, sir.

16   **Q.**   I want to ask you something about your
17   Declaration.  Is there a mistake in that Declaration?
18   Actually, I will hand it to you.

19        MR DIXON:  Objection, Your Honor.  That's exactly
20   what I requested to strike and he said it wasn't going to be
21   used in this procedure today.

22        MR. CLEVENGER:  I'll withdraw then.

23        THE COURT:  Okay.

24        MR. CLEVENGER:  I'll withdraw.

25   Q.   (By Mr. Clevenger)  What is the name of the

1  lieutenant who works at Hearne PD?

2      A.   Lieutenant Armstrong, Pat Armstrong.

3      Q.   And he testified here today, correct?

4      A.   Yes, sir.

5      Q.   Did he tell you that the DA was not going to press

6  charges?

7      A.   He told me the case was dropped, the assistant --

8  I don't know what you call her -- advocate, I guess.  I

9  don't know.

10     Q.   Would that be Cindy Wallace?

11     A.   Ms. Cindy Wallace told --

12          MR DIXON:  Objection hearsay.

13     Q.   (By Mr. Clevenger)  Did you talk to Cindy Wallace

14  directly?

15     A.   Yes, sir.

16          MR DIXON:  Objection hearsay.

17          THE COURT:  I don't know what the question is yet.

18          MR. CLEVENGER:  Let me back up.

19     Q.   (By Mr. Clevenger)  What exactly did Lieutenant

20  Armstrong tell you?

21     A.   After leaving the D.A's Office, I called

22  Lieutenant Armstrong and asked him what was the deal on the

23  case.  And he went to telling me that they didn't find

24  anything, that it had been referred to the DA's Office, and

25  at this point we heard that the D.A's Office and Texas

1   Rangers was handling the case.

2           I, in turn, asked him, what's the status?  Which I

3   had just left the DA Office and Cindy Wallace had told me it

4   was dropped.  He, in turn, told me, Well, we're going to

5   drop it.

6       Q.   And was he indicating that Hearne PD was going to

7   drop it?

8       A.   I assumed that he was because I was speaking of

9   what they were going to do, what was the status.

10      Q.   Okay.  I want to ask you some questions about the

11  trial that was scheduled for last year.  Were you present at

12  the pretrial hearing?

13      A.   Yes, sir.

14      Q.   And did the judge admit that he had received

15  information *ex parte* from a City employee?

16      A.   Yes, sir.

17      Q.   Did he order the public excluded from the trial?

18      A.   Yes, sir.

19      Q.   Had he given us any advanced warning that he was

20  going to do that?

21      A.   No, sir.

22      Q.   Did I ask for his recusal?

23      A.   Yes, sir.

24      Q.   Did he recuse?

25      A.   After Ms. Felton told him that that was the right

1  thing to do.

2      **Q.**  But he did recuse?

3      A.  He did.

4      **Q.**  I have previously offered an email into evidence.

5          MR. CLEVENGER:  If I may, Your Honor, I'm going to

6  show that to Mr. Jackson?

7          THE COURT:  Sure.

8      Q.  (By Mr. Clevenger)  Mr. Jackson, have you seen

9  that email before?

10     A.  Yes, sir.

11     **Q.**  And did I forward it to you at the time?

12     A.  Yes, sir.

13     **Q.**  Who is Dennis Phillips?

14     A.  He's the publisher for the Robertson County

15  Newspaper.

16     **Q.**  And does this email indicate that somebody had

17  tipped him off that you would be charged with a Class C --

18     A.  Yes, sir.

19     **Q.**  And this was before you were cited, correct?

20     A.  Yes, sir.

21     **Q.**  And it was before either one of us were informed,

22  correct?

23     A.  Correct.

24     **Q.**  How long has this criminal case been pending

25  against you?

1    A.    Over a year and a half, I believe.

2    Q.    You testified about how it affected your job.  Do

3  people treat you differently now?

4    A.    Oh, yes, sir.

5    Q.    How so?

6    A.    I don't -- they don't speak to me.  I hear

7  comments, sex offender.

8    Q.    Okay.

9        MR. CLEVENGER:  No further questions, Your Honor.

10                  ==================
                    CROSS-EXAMINATION
11                  ==================

12  BY MR DIXON:

13    Q.    Mr. Jackson, in your house -- since y'all opened

14  this up -- in your house did you try to kiss this young

15  lady?

16    A.    No, sir.

17    Q.    Did you say anything to her about how she should

18  sleep with you?

19    A.    No, sir.

20    Q.    Did you put your hand on her thigh -- and I'm not

21  saying her private area, but did you run your hand up her

22  thigh?

23    A.    No, sir.

24    Q.    And she never tried to run out of your house but

25  the door was -- she couldn't get out of the alarm system?

1    A.    Can I answer that question the way it happened?

2    **Q.**    Yeah.  Go ahead.

3    A.    She woke me up the next morning and said, Pepo,

4    can you let me out so I can go to my sister's house.  I

5    asked her was her sister awake and she said, Yes.  I

6    disalarmed the -- and she went out.

7    **Q.**    So it was in the morning that that happened?

8    A.    Yes, sir.

9    **Q.**    It wasn't at any -- so like what time in the

10   morning did that happen?

11   A.    Sir, I'm not sure at what time because I was

12   tired.  I had been working all day and she went to work with

13   me for several hours.

14   **Q.**    Did -- what motivation does this little girl have

15   to lie, I mean, I'm trying to figure that out.  Do you have

16   a theory on that as to why she would lie and make all this

17   stuff up?

18        MR. CLEVENGER:  Objection, calls for speculation.

19        THE COURT:  Sustained.

20   Q.    (By Mr Dixon)  Do you know -- do you know of

21   anybody promising this little girl anything?  Do you

22   personally know of anybody promising this little girl

23   anything to lie about this?

24   A.    Personally know?  Proven?  Factual?  No.  No, sir.

25   I was told.

1     **Q.**   What were you told?

2     A.   That she said at school that they gave her a

3  thousand dollars and they can't get their money back now.

4     **Q.**   And who are "they"?

5     A.   That's what I heard, "they."  I don't know.  Good

6  question.

7     **Q.**   Okay.  You do realize, sir, that, you know, a

8  Class C is not a bad -- not that bad a deal, but perjuring

9  yourself in federal court, it can be a really bad deal.  Do

10  you understand that?

11     A.   Yes, sir.

12     **Q.**   But this little girl, apparently, has been

13  subjected to name calling and retaliation?

14          MR. CLEVENGER:  Objection, more speculation.  Not

15  in evidence at all.

16          MR DIXON:  Okay.

17          THE COURT:  Sustained.

18     Q.   (By Mr Dixon)  Do you think it would in any way

19  benefit her to --

20          MR. CLEVENGER:  Same objection as earlier.  This

21  is calling for more speculation.

22          THE COURT:  I'll allow you to ask that question.

23          MR DIXON:  Well, I'll --

24     Q.   (By Mr Dixon)  Had she ever made up anything about

25  you before?

1    A.    Not to my knowledge.

2    **Q.**    And in any other of the communities you've lived

3  in if there were any allegations similar to this, would

4  those people be making it up too?

5    A.    Can you repeat the question, please.

6    **Q.**    In any communities you've lived in before this, if

7  there were similar types of allegations or rumors going

8  around, would those people be making those up too?

9          MR. CLEVENGER:  Objection.

10          THE COURT:  Sustained.

11    Q.    (By Mr Dixon)  Are you aware of any previous

12  allegations?

13          MR. CLEVENGER:  Objection.

14          THE COURT:  What's the question?  Allegations of

15  what?

16          MR DIXON:  Of being inappropriate towards little

17  girls.

18          THE COURT:  Against him?

19          THE WITNESS:  Against me?

20    Q.    (By Mr Dixon)  Yeah.  Anywhere.

21    A.    Oh, no, sir.

22    **Q.**    Not hanging on them or being too close with them?

23    A.    No, sir.  I mean, I love kids.  I've always loved

24  kids.  I was general youth director for Fellowship United

25  District Association for eight years.  I worked at the

1  school district for eleven years.  I give kids money.  I fed

2  kids, clothed kids.  I love kids.  I have nine grandkids.

3  I've always expressed my love for kids.  I've never, in this

4  lifetime in no other -- anybody else's lifetime would do

5  anything to harm any kid.

6      Q.   Had you been drinking the day that -- or at any

7  time when the female was living at your house, had you

8  drank?

9      A.   Repeat the question.

10     Q.   Had you drank alcohol at any time while the female

11 was living at your house?

12     A.   Socially, yes.

13     Q.   What do you --

14     A.   That night, no.

15     Q.   That night.

16          So then, the night -- I mean, I'm kind of getting

17 confused because you seem to have specific recollection of

18 some things but not others.  So that night, what are you

19 talking about?

20     A.   I was told that I supposed to have gotten drunk --

21 that this is what I was told because no one ever interviewed

22 me, no one ever questioned me.  And that was my question:

23 Why isn't anyone coming to me to ask me any questions?  But

24 I was told this, that I supposed to have been drunk and I

25 supposed to have to tried to molest her.  That's --

1  that's -- that's what I was told by community people, which
2  at that time no one had come to me and asked me anything.
3      **Q.**   Now, do you realize you've sued Stephanie
4  Rodriguez in this case?
5      A.   Yes, sir.
6      **Q.**   You sued her for monetary damages, right?
7      A.   Yes, sir.
8      **Q.**   Okay.  And that's the victim's mother, correct?
9      A.   Yes, sir.
10      MR. CLEVENGER:  Objection, it assumes there's a
11  victim here.
12      Q.   (By Mr Dixon)  Okay, or the alleged victim's
13  mother.
14      That's the alleged victim's mother, correct?
15      A.   Yes, sir.
16      **Q.**   Did you hope to maybe scare her off or got her off
17  from testifying in her case or to drop the case?
18      MR. CLEVENGER:  Objection, this has nothing to do
19  with the issues in front of the Court.
20      MR DIXON:  Well, it really does.
21      THE COURT:  I'll let you ask the question.  I'll
22  let you ask the question.
23      Q.   (By Mr Dixon)  I mean, I'm saying, you have a
24  criminal case against you that before you wanted speedy
25  trial on but all of a sudden you don't want it?

1    MR. CLEVENGER:  Objection, he's giving testimony.

2    Q.    (By Mr Dixon)  Was there any discussion about how

3    suing Ms. Rodriguez might make this go -- this criminal case

4    go away?

5    A.    No, sir.

6    Q.    So explain to me exactly why you are suing

7    Ms. Rodriguez?

8    A.    Ms. Rodriguez is the female minor's mother who in

9    turn I tried to talk to and she did not want to talk to me,

10   even told that if she -- that morning she started to get her

11   gun and come to my house and blow my head off and we had

12   been friends for years and I didn't understand and still

13   don't understand why.

14   Q.    But because of your hurt friendship or her being

15   hateful towards you, that's why you've sued her?  I'm trying

16   to figure out why you've sued her for monetary damages?

17   A.    She's a part of what's going on.

18   Q.    How is she a part of what's going on?

19   A.    The rumors.  I mean, she's a part of all of this.

20   I went to where she used to work and to take my grand baby

21   and the lady who owned the place told me that she was up

22   there talking about me like a dog, and I'm just like -- I

23   didn't know she didn't work there any more because I had

24   just stopped going.

25   Q.    Let me ask you something, sir.  If your

1  daughter -- let's say one of your granddaughters came

2  home -- and I've got -- I had one just last week, in fact --

3  but say one of your granddaughters came to you and said,

4  Pepaw, so and so tried to touch me or was getting handsy

5  with me or, you know, said something inappropriate to me.  I

6  imagine you would be pretty peeved too, wouldn't you?

7       A.   With any child, just not my grandchildren.

8       Q.   Well, I understand that.  But can you see where

9  the victim's mother would tend to believe their daughter or

10  to -- especially if the daughter's crying, or whatever,

11  would tend to want to take up for her?

12       A.   Yes, that's a mother's instincts.

13       Q.   You've been on -- you've had this charge pending

14  since July.  Why did you just now file this federal suit?

15  What was the reasoning behind that --

16       A.   It seemed --

17       Q.   -- delay?

18       A.   It seems to me that it's been just ongoing,

19  ongoing, and I have been trying to get this over with, to

20  get my life started back.  Because not only was Ms.-- or

21  whoever's -- life been hurt, mine has been hurt and I felt

22  like I've suffered long enough and justice needs to be

23  served and I want my life back.

24       Q.   You got that opportunity on February 2nd, in front

25  of a jury of your peers in justice court.  Do you want to

1  take that opportunity and get it over with or is it ease --

2  or does it make more sense to have -- file a civil suit and

3  have more years of delay?

4      A.   Well, Mr. Naron has -- I believe in my heart that

5  he has a lot to do with it.

6      Q.   Do you believe in your heart?

7      A.   Vindictively, Mr. Naron has shared numerous

8  comments toward me.  I've seen Mr. Naron, after this,

9  walking back and forward from the police station.  I was

10  told that Mr. Naron was pressuring --

11      Q.   Who told you that?  Who told you that?  I need to

12  know who told you that.  You've opened the door now.

13      A.   Our new, whatever you want to call it, municipal

14  judge, Hazel Embra.

15      Q.   Okay.  So the new municipal judge said that --

16  told you that Mr. Naron was pressuring the police?

17      A.   Not pressuring, but Mr. Naron has something to do

18  with it.

19      Q.   Okay.

20      A.   I was also told by a former City Council member

21  everything about the case, who is Ms. Hazel Embra's friend,

22  and those listed told me -- we worked together part-time --

23  told me everything about the case that I didn't know, and

24  I'm wondering how does she know.

25      Q.   Well, you have no personal knowledge other than

1  you've heard some talk, or apparently heard some gossip.

2  You have no personal knowledge that Mr. Naron or anybody

3  else, for that fact, pressured or directed the charge to be

4  brought against you?

5      A.   I wasn't there.  No, I don't.

6      Q.   Okay.  So pretty much all of this, in your -- your

7  Complaint about Ms. Rodriguez contacted Mr. Naron and

8  Mr. Naron was only too happy to help and then he went down

9  and directed the police to file the charge, that's all

10 speculation, isn't it?  You have no idea whether that's what

11 occurred?

12      MR. CLEVENGER:  Objection, Your Honor.  That was

13 written by me and I conducted my own investigation.

14      THE COURT:  You can ask him about his personal

15 knowledge of any of that.

16      MR DIXON:  Do you have any personal knowledge of

17 any of those things?

18      A.   No, sir.

19      Q.   Isn't Mr. Naron -- Mr. Naron was actually hired

20 after all the stuff you talked about before, about the

21 petitions and all of that stuff that's been testified back

22 with your electricity, that was all during a former City

23 Manager, wasn't it?

24      A.   The electricity, yes, sir.

25      Q.   And the Petition was, too?

1     A.   The who?

2     **Q.**   The Petition was also?

3     A.   No, sir.  Mr. Naron was serving as Interim City

4 Manager when the Petition to Recall me --

5     **Q.**   No, I'm talking about the Petition for Forensic

6 Audit that you talked about in your Complaint.

7     A.   He came on board in the midst of.  It wasn't -- he

8 came on board in the midst of.

9     **Q.**   Of the lawsuit that followed, not during the

10 Petition, right?

11     A.   Not in the Petition?  I'm not quite sure.  I can't

12 recall.

13     **Q.**   I was just going by the order of things in your

14 Complaint.

15         Now, do you think -- so you and Mr. Naron don't

16 get along and you feel like that y'alls personal animosity

17 or his personal animosity towards you, it has something to

18 do with your criminal case; is that correct?

19     A.   Yes, sir.

20     **Q.**   But you don't have any proof of it?

21     A.   No, sir.

22     MR DIXON:  No further questions.

23

24

25

======================
REDIRECT EXAMINATION
======================

BY MR. CLEVENGER:

Q.    Mr. Jackson, do you believe that Stephanie Rodriguez is the one who was involved in pushing the charges against you?

A.    Actually I was told she was by Mr. Jim Nabiles (phonetic), sir.

Q.    And were you also told by Chief Williams that the reason they decided to bring the charge is because the family was pushing for it?

A.    Yes, sir.  He told me that he had received pressure from the family.

Q.    And that was the chief that told you that?

A.    Yes, sir.

Q.    Why was this young woman kicked out of her house by her mother?

A.    Because she had been sneaking a young man in her mother's house, skipping school, having sex, and her mother told me she didn't want the B in her house.

Q.    And did the minor also confirm that she had been sleeping with this boy?

A.    Yes, sir.

MR. CLEVENGER:  No further questions, Your Honor.

MR DIXON:  All I have to say is, wow, slut shaming

1   and suing the victim's mother.

2           MR. CLEVENGER:  That's sanctionable.

3           MR DIXON:  I'm sorry.

4           THE COURT:  Don't do that again.

5           MR DIXON:  Nah.

6           THE COURT:  Don't do that again.

7           MR DIXON:  Okay.

8           THE COURT:  Do you have any further questions?

9           MR DIXON:  No.

10                  *    *    *    *    *

11          (End of excerpted proceedings requested

12          by counsel.)

# C E R T I F I C A T E

I, Pamela J. Andasola, Certified Shorthand Reporter, Registered Merit Reporter, Federal Certified Realtime Reporter, in my capacity as Official Reporter do hereby certify that I was present and recorded the above proceedings in stenotype and reduced the same to typewritten form, that the foregoing 24 pages constitute a true and complete record of the proceedings, to the best of my ability, had and done on January 29, 2018, before the Honorable ROBERT PITMAN, Courtroom 4 of the United States District Court, Western District of Texas, Austin Division.

Dated this 2nd day of February, 2018.

s/Pamela J. Andasola
PAMELA J. ANDASOLA, CSR/RMR/FCRR